NOT DESIGNATED FOR PUBLICATION

No. 117,127

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
M.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 1, 2017.
Affirmed.

*Catherine A. Zigtema*, of Zigtema Law Office LC, of Shawnee, for appellant natural father.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for
appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM: Father appeals the district court's termination of his parental rights
to his son, M.H. Mother's rights to this son were also terminated, and she brings a
separate appeal. Father contends that the district court erred in finding him an unfit parent
and in finding termination is in the best interests of his child. He also contends he failed
to receive proper notice of the proceedings against him. Finding no error, we affirm.

*Factual and procedural background*

M.H. is a child under the age of 18, born in 2004. In September 2009, when he
was five years old, he was adjudicated as a child in need of care (CINC) due to conditions

1

of the home and the family's resistance to services. M.H. was removed from the home and placed in foster care but was reintegrated with his parents by October 2010.

In early 2014, Mother and Father entered pleas of guilty to certain counts of a 22-count federal indictment for various types of fraud. Mother is incarcerated in a federal medical center in Texas. Her earliest possible release date is in November 2020. Father is incarcerated in a federal correctional facility in Indiana. His earliest possible release date is in February 2022.

Before the parents' imprisonment, Father took M.H. to G.B., an acquaintance of his, and asked G.B. to take care of him while Father was incarcerated. Father signed some type of permission for M.H. to stay with G.B.'s family, which included G.B., his wife, and their three children, two of whom had special needs.

In July 2014, the Department for Children and Families (DCF) received a report that M.H. had been abused while in foster care in 2009-2010. DCF investigated and found the report unsubstantiated. DCF received another report regarding M.H. in March 2015—a nonabuse and neglect report regarding the relationship between M.H. and G.B. DCF assessed the situation but no services were recommended because M.H. was already in therapy.

On December 14, 2015, G.B. contacted police to have them remove M.H. from his home and reported the following information to them: He had been caring for M.H. for approximately a year and a half, since Father had left him there before going to prison; M.H. had been abused and tortured by his parents and raped by his foster parents in Missouri; Father was a martial arts expert who punished M.H. if he showed any emotion; M.H. talked about killing his parents and foster parents, and it was his life's mission to do so; M.H. posed a safety risk to G.B.'s own three children; and he and his wife no longer felt equipped to care for M.H. due to his mental health needs and threats of violence.

Police took M.H. to the Juvenile Intake and Assessment Center and interviewed him. He stated he was determined to get revenge on his parents and foster parents and that he was "consumed" with this idea and did not care if he hurt others in his desire to obtain revenge. M.H. provided graphic descriptions of killing his parents and foster parents but admitted he did not have a plan to do so. He claimed that if he could, he would go to school and kill everyone to show his parents he is serious. Later that day, M.H. was interviewed by a DCF social worker. M.H. told her he did not feel angry but had violent thoughts of killing his parents and foster parents. He disclosed that he had cut himself with a knife in an attempt to commit suicide. M.H. consistently reported this same information to multiple professionals who spoke with him, including a police officer, a juvenile intake specialist, and the DCF social worker. During M.H.'s stay with G.B.'s family, he had been admitted to Marillac as an in-patient on two occasions and had a seven-week in-patient stay at Kids TLC.

On December 15, 2015, the State filed a petition to adjudicate M.H. a CINC. The same day, M.H. was placed in the temporary custody of the Secretary of DCF due in part to an emergency. At the CINC hearing, Mother participated by telephone and was represented by her attorney. Father did not participate but was represented by his attorney. The district court found clear and convincing evidence that M.H. was a CINC and adjudicated him as such. The court also found reintegration with the parents was not a viable option.

On July 7, 2016, the district court held a trial on the motion to terminate parental rights. Both Mother and Father were represented by counsel, and both were allowed to participate by conference call.

Before hearing testimony, the district court took judicial notice of the files in the 2015 CINC case, as well as those files in the 2009-2010 CINC case, a previous child support case, and the federal criminal cases regarding the parents' convictions. The

district court accepted into evidence the following exhibits: (1) the parents' federal indictment; (2) the second superseding indictment; (3) the amended judgment regarding Mother; and (4) the amended judgment regarding Father.

Testimony was given by the DCF social worker assigned to M.H.'s case, by M.H.'s case manager from KVC Behavioral Health System, and by Father. Father's testimony focused largely on his appeals in his criminal case. Father did indicate he had family members willing to care for M.H. and specifically named J.G., his half-sister on the East Coast. Mother chose not to testify.

On July 26, 2016, the district court issued a memorandum decision. The court summarized the CINC history of M.H. and the circumstances surrounding his present status as a CINC. This included his parents' long-term incarcerations, the resignation of the custodian Father had arranged M.H. while they were in prison, and M.H.'s mental and emotional issues, including his homicidal ideation toward his parents. The court found that M.H. has "significant behavioral and mental health issues, and his needs in both regards are substantial." The district court found clear and convincing evidence to find Mother and Father unfit as parents pursuant to K.S.A. 2016 Supp. 38-2269(b)(5) for their felony convictions and imprisonment, and K.S.A. 2016 Supp. 38-2269(b)(8) for their lack of effort to adjust their circumstances, conduct, and conditions to meet the needs of M.H. The district court found these conditions of unfitness were unlikely to change in the immediate or foreseeable future. The district court noted that M.H. had no relationship with his parents, and that he did not want one. The court found that a permanent custodianship was not the best permanency goal for M.H. because of his need for insurance and possible subsidy obtained through adoption and because M.H. strongly opposed contact with his parents. Finally, the district court found it in the best interests of M.H. to terminate the parental rights of Mother and Father.

Father timely appealed the district court's judgment.

4

*The governing law*

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2016 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

On appeal, we review a district court's decision to terminate parental rights to determine if, after reviewing all of the evidence in the light most favorable to the prevailing party, a rational fact-finder could have found it highly probable that the parent's rights should be terminated. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). The evidence must be clear and convincing. K.S.A. 2016 Supp. 38-2269(a). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re M.H.*, 50 Kan. App. 2d at 1170.

*Father's unfitness due to his conviction of a felony and imprisonment*

We first address Father's contention that the evidence did not support a finding of unfitness under K.S.A. 2016 Supp. 38-2269(b)(5)—"conviction of a felony and imprisonment."

Our law, as stated in K.S.A. 2016 Supp. 38-2269(b)(5), provides that in making a determination of unfitness, the court shall consider conviction of a felony and imprisonment. In this case, the relevant facts are undisputed. Father entered a plea of

5

guilty to certain counts of a 22-count federal felony indictment, was convicted of those counts, and was sentenced to 108 months in prison commencing in December 2014.

Father argues that the court's finding of unfitness is improper because his appeal of his conviction is not yet final. Instead of citing the relevant statute, Father cites federal criminal procedures and suggests that the district court should have sua sponte taken judicial notice of his federal appeals. Father does not cite any authority in support of his claim that the termination of his parental rights should be stayed until his appeals are decided. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015). And the plain language of K.S.A. 2016 Supp. 38-2269(b)(5) requires the district court to consider "conviction of a felony and imprisonment." This language does not require a determination that the conviction is final—a determination that may take years.

Father also contends that incarceration can be a mitigating factor. But where, as here, Father's incarceration is a cause of further delays that are not in the best interests of the child, incarceration is a negative factor. *In re M.H.*, 50 Kan. App. 2d at 1172.

Father primarily claims that the State improperly relied solely on the length of his incarceration.

We agree that the court must look to more than the length of a parent's incarceration. When a parent is imprisoned for a long term and cannot provide the customary parental care and guidance, the trial court must consider the extent to which the imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship with the child. The sufficiency of those efforts is for the trial court to determine. *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

6

Father contends that he made substantial efforts to fulfill his obligations despite his incarceration. Father cites the following efforts:  the guardianship he created with G.B.'s family before he went to prison, his participation in the case planning call and the six-month evaluation call, and his participation at trial. The balance of Father's argument merely indicts DCF for not allowing him to make an alternate arrangement for guardianship and the State for not making reasonable efforts to obtain the necessary mental health services for M.H.

The record contradicts Father's argument by showing that Father made no attempt to communicate with M.H. while in prison. Nothing in the record shows that Father tried to communicate with M.H. while he was living with G.B.'s family. In fact, Father did not even communicate directly with that family; Father claims he tried to maintain contact with them only indirectly, through M.H.'s grandfather. And in the seven months between the date that M.H. was taken into custody and the date of the termination trial, Father participated in only one teleconference, which was initiated by the KVC case worker. Father presented no evidence showing he had any contact, bond, or relationship whatsoever with M.H.; no evidence to show his awareness of or involvement in M.H.'s treatment or care; and no evidence that Father either had or expressed any feelings whatsoever for his son. The record reflects that M.H. has only negative feelings about Father. We find clear and convincing evidence in the record that Father did not make reasonable attempts, even given the limitations imposed by his prison conditions, to contact and maintain an ongoing relationship with his son.

*Unfitness in the foreseeable future*

Father argues that if he is successful in his appeal of his criminal case, his conviction and/or sentence could change in the foreseeable future. Father testified that his first appeal resulted in a remand for resentencing. He claimed that he filed a second appeal in his criminal case but indicated his brief was not due for another two weeks, and

7

that he did not know when his second appeal would receive a ruling. He acknowledged that he was in prison based on a plea, and that his current "out date" was in 2022. He stated that he participated in his presentence investigation via telephone, did not believe he was going to be placed on probation, but that no one had ever told him what his sentencing range would be. When asked if he had appealed his sentence, Father indicated vaguely that it was part of his appeal but the rest was about judicial corruption, witness threats, and tampering by the public defender's office, saying, "it is lengthy, very lengthy."

Courts must strive to decide these cases in "child time" rather than "adult time." *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002). Were children held in limbo while awaiting the various direct appeals and subsequent petitions for review and petitions for certiorari that are necessary before a felony conviction can be deemed final, years could easily pass. Children need not make that sacrifice for their felonious parents.

A parent's actions, not intentions, are the measure to be used in determining likelihood of change in the foreseeable future:

> "But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237.

A parent's past behavior is a strong factor in predicting future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Father's past behavior shows an unswerving pattern of no communication with his son. Nothing in the record shows that Father's inattention to his son may change in the future. Father's past inactions, coupled with the length of Father's sentence, support a finding that his condition is unlikely to change in the foreseeable future, as is required by K.S.A. 2016 Supp. 38-2269(a).

*The best interests of the child*

The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment absent an abuse of judicial discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). When determining if terminating parental rights is in the best interests of a child, "the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1).

Father contends that because finding an adoptive home for M.H.—a "severely disabled teen aged boy"—will likely be immensely difficult, the district court abused its discretion in finding that termination was in the best interests of the child. Father contends that DCF did not make any inquiry regarding alternate family placement options for M.H. and that his sister in North Carolina may be willing to serve as M.H's permanent custodian. Father alleges that the State failed to prove that adoption is the only way to provide insurance and resources for the care of M.H.

As an initial matter, the State need not demonstrate that alternate means of meeting a child's basic needs exist; the standard is what is in the best interests of the child. It is the court's responsibility to determine how to best serve a child's physical, mental, and emotional needs. K.S.A. 2016 Supp. 38-2269(g)(1); See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

The district court held that a permanent custodianship was not in M.H.'s best interests and was not the best permanency goal for him, stating, "not only because of the need for insurance and subsidy obtained through the pursuit and completion of adoption,

9

but also based upon the fact that the relationship between the parents and their son is nonexistent and any contact is strongly opposed . . . by the child. Theirs is a broken relationship that has little to no hope of repair."

The district court heard the testimony that M.H. had a possible placement option with his Father's sister and that an Interstate Compact on Placement of Children transfer had begun but then stalled because the aunt was moving from South Carolina to North Carolina. But M.H. had never met that aunt. The district court also heard testimony that a permanent custodianship was not appropriate because M.H. would not receive "subsidy or insurance," and that in a permanent custodianship, a child over 14 years of age does not receive subsidies or health insurance. Whether M.H., as a ward, could be covered through the aunt's private insurance plan or that of her husband was unknown. The district court also heard evidence that M.H. receives social security disability through Mother, which would end if her parental rights were terminated. Nonetheless, M.H.'s case manager and his guardian ad litem both opined that a permanent custodianship was not in his best interests.

Rather than demonstrate how the district court abused its discretion, Father simply argues for an alternative interpretation of the evidence. But an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re M.H.*, 50 Kan. App. 2d at 1170.

Father fails to acknowledge that he made little to no effort in fostering a relationship with M.H. after M.H. went into the State's custody, and the record is largely silent as to Father's efforts prior to that. Father did not take advantage of his opportunity at trial to show that he had any relationship with M.H. before he went to prison or to show that he could best meet M.H.'s needs from prison. See *In re D.T.*, 30 Kan. App. 2d at 1175 (demonstrating the unreasonableness of placing the wants of the parent over the best interests of the child).

10

The district court considered the physical, mental, and emotional health of M.H. The evidence shows a child who had been in and out of the system since he was five years old. Mother and Father placed M.H. with a custodian with dubious legal authority to try to meet his physical, mental, and emotional needs while they were taken into federal custody and sentenced to nine years in prison. M.H. expressed homicidal ideation regarding his parents, and it was his life's mission to kill them, regardless of hurting other people. M.H. had begun to act out his violent impulses. M.H. experienced suicidal ideation and had taken overt steps to commit suicide at least three times. M.H. needed therapy and services, which required insurance more likely attainable through adoption than through a permanent custodian. M.H. consistently refused to accept any communication from his parents. While away from his parents and while receiving sustained, consistent services, he was learning to use coping skills and to enjoy his community. M.H. was doing well in school, wanted to start volunteering at an animal shelter, and had requested more therapy.

Waiting additional time is not in M.H.'s best interests. See *In re M.H.*, 50 Kan. App. 2d at 1170-71. M.H. was taken to stay with G.B.'s family in approximately March 2014 when he was barely 10 years old. He has been in the State's custody since December 2015 when he was 11 years old. As of the hearing of this appeal, M.H. has been in the State's custody for nearly two years, and he is approaching his 14th birthday. Assuming Father's early release date of 2022 is accurate, M.H. will be 18 years old when Father is released. M.H. has the right to permanency within a time frame that is reasonable to him. See 50 Kan. App. 2d at 1170-71.

Based on the facts of record, a reasonable person could conclude that the child is better off if a permanent placement goal of adoption is pursued to provide him with the physical, mental, and emotional care and the support and stability he deserves and requires. We thus find no abuse of discretion in the district court's finding that termination of Father's parental rights is in M.H.'s best interests.

*Adequacy of notice*

We note Father's additional argument that the State deprived him of his statutory and constitutional rights to due process by failing to give him adequate notice of *other* grounds for terminating his parental rights. Specifically, Father contends that the motion to terminate his parental rights did not allege specific facts to support an allegation that he failed to adjust his circumstances, as is required to terminate under K.S.A. 2016 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"). We find it unnecessary to reach the merits of this issue because even assuming the correctness of Father's argument, we find clear and convincing evidence that independently supports the termination of Father's parental rights pursuant to K.S.A. 2016 Supp. 38-2269(b)(5), which was adequately noticed, fully argued by the State at trial, and properly found applicable by the district court. Thus, there is no reasonable possibility that the error affected the outcome of this case. See *State v. Hurley*, 303 Kan. 575, 583-84, 363 P.3d 1095 (2016). We note, however, that we do not condone the State's practice, demonstrated in this case, of noticing all the statutory grounds for termination of parental rights when it does not intend to pursue all of them.

Affirmed.